883 F.2d 221
 58 USLW 2211, 11 Employee Benefits Ca 2198
 PAYONK, Paul L., and Hamilton, John J., Individually and on
behalf of all others similarly situated, Appellants,
v.
HMW INDUSTRIES, INC., Hamilton Technology, Inc., Clabir
Corp., Bernhardt, Kenneth R., Strantz, Gloria G.,
and Clarke, Henry D., Jr.
Appeal of Paul L. PAYONK and John James Hamilton,
Individually and on behalf of all others similarly
situated, Appellants.
 No. 88-1577.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 24, 1989.
Decided Aug. 23, 1989.
Rehearing and Rehearing In Banc Denied Sept. 27, 1989.
 
 Christopher W. Mattson, David R. Keller (Argued), Michael A. Moore, Barley, Snyder, Cooper & Barber, Lancaster, Pa., for appellants.
 Jeffrey S. Saltz (Argued), Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for appellees.
 Before STAPLETON, MANSMANN and GARTH, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal, which arises from two corporate reorganizations and the consequent termination of a pension plan, requires us to answer the question: do pension plan fiduciaries have a duty under Sec. 404 (29 U.S.C. Sec. 1104) and Sec. 406 (29 U.S.C. Sec. 1106) of the Employee's Retirement Income Security Act (ERISA) to notify the former members of a plan who now claim an interest in a plan surplus, of a termination of the plan prior to the ten day requirement of the Pension Benefit Guaranty Corporation (PBGC)[1] regulations found at 29 C.F.R. 2616 et seq.? We conclude that in the circumstances presented here, no notification was required beyond the 10-day notice mandated by the regulation.[2]
 
 
 2
 The district court granted defendants' motion for summary judgment and denied the plaintiffs' motion for partial summary judgment, holding that the duties embodied in Sec. 404 and Sec. 406 did not apply to HMW's business decision to terminate the pension plan. We affirm.
 
 I.
 
 3
 The plaintiffs, represented by John J. Hamilton and Paul L. Payonk ("Payonk"), consist of a class of employees or former employees of Hamilton Precision Metals ("Metals") and of Wallace Silversmiths, Inc. ("Wallace") who withdrew from a defined benefit pension plan shortly before its termination and, therefore, did not share in the distribution of the surplus of the Plan. The defendants, HMW Industries, Inc., Hamilton Technology, Inc., Clabir Corp., Bernhardt, Kenneth R., Strantz, Gloria G., and Clarke, Henry D., Jr., are alleged to have breached their fiduciary duty by failing to inform Payonk of the impending plan termination and by self-dealing.[3] The relevant facts, none of which are in dispute, have been detailed by the district court in its Memorandum and Order of June 27, 1988. We reproduce the pertinent portions of that recital supplemented by additional facts disclosed in the record.
 
 
 4
 Prior to August 5, 1983, Wallace, HamTech and H-K Exchange, were wholly owned subsidiaries of HMW. The employees of these subsidiaries, including Metals, were participants in the HMW plan, an overfunded pension plan that was funded by both employer and employee contributions. On August 5, 1983, Katy Industries, a corporation not a party to this action, acquired Wallace and Metals from HMW. As a result of this divestiture, Wallace and Metals employees were no longer considered employees of HMW under the terms of the HMW plan and could no longer accrue benefits under the Plan. However, the divestiture did not affect benefits that had already accrued to those employees and they were entitled to withdraw their accumulated employee contributions with interest at anytime. During the fall of 1983, HMW arranged with Connecticut General Life Insurance Company to purchase annuities covering the accrued benefits of the Wallace and Metals HMW plan participants.
 
 
 5
 On October 25, 1983, in response to several requests from Wallace and Metals employees, defendant Strantz wrote to each Wallace and Metals employee stating the amount of employee contribution that each could withdraw from the HMW plan. Strantz's letter explained further that the employees had the option of withdrawing their employee contributions from the HMW plan immediately or leaving their contributions in the plan until regular retirement age. This letter did not inform plaintiffs that they could share in any surplus should the HMW plan be terminated if they left their contributions in the plan until termination. Only a few employees withdrew their contributions during the last few months of 1983.
 
 
 6
 On February 1, 1984, Wallace announced its new employee benefits package. The new package included a Guaranteed Retirement Income Plan pursuant to which the employees would be guaranteed payments at retirement at least as high as those they would have received as HMW plan participants. To be eligible for the new plan, all employees had to roll over their employee contributions from the HMW plan to the Wallace Plan. Hartford Life Insurance Co., the administering company of the new plan, also agreed to guarantee a 12.75% interest rate on the rolled over funds for the first five years. To take advantage of this guaranteed interest rate, however, the employees had to roll over their HMW contributions within a limited specified period.
 
 
 7
 A similar announcement was made by Metals on February 23, 1984, followed by a confirming letter to the employees dated March 1, 1984. The new Metals plan offered the same plan and 12.75% interest rate opportunity as the Wallace plan. Both Wallace and Metals management encouraged their employees to roll over their HMW contributions to the new plans. These announcements were followed by mass withdrawals from the HMW plan.
 
 
 8
 Soon after Katy Industries acquired Wallace and Metals. Defendant Clabir obtained a controlling interest in HMW. Clabir's Director of Administration, Richard Van Hoesen, was directed to bring the HamTech (HMW's remaining subsidiary) retirement program into conformity with the Clabir Plan which was an employer contribution plan rather than a matched employer-employee plan. In order to do so it appeared that the old HMW Plan would have to be terminated.
 
 
 9
 On December 19, 1983 Van Hoesen received a copy of a letter from James M. Schell, his supervisor at Clabir, addressed to John L. Owen, the Human Resources Supervisor at HamTech, directing that preparation should begin in the process of terminating the HMW Plan. Although termination was still tentative, it was apparently Schell's intention to get the administrative process started. On January 5, 1984, representatives of Clabir met with representatives of HamTech and Connecticut General Life Insurance Company to discuss the possible termination of the HMW plan and its replacement with a new retirement plan patterned after the plans at other Clabir subsidiaries. Because of the matters raised at the meeting, the tentative target date of February 1, 1984 for the termination of HMW's plan was pushed back to March 1, 1984. After a number of meetings, the resolution of certain logistical problems and three changes in the proposed termination date, the HMW Board of Directors passed a resolution on March 7, 1984 terminating the HMW plan effective March 31, 1984.
 
 
 10
 In accordance with regulations promulgated by the Pension Benefit Guarantee Corporation (PBGC), defendant Strantz sent out a package of letters dated March 12, 1984 to Wallace and Metals for distribution to employees notifying them of the decision to terminate the HMW plan. These letters were accompanied by notices of termination dated March 14, 1984. HMW filed its notice of termination with the PBGC on March 21, 1984. The PBGC ultimately approved the termination effective March 31, 1984. PBGC approval for the termination of the old HMW Plan took fourteen months and was issued in May, 1985. It was then that management learned that only those employees who were still participants in the old HMW Plan on the March 31, 1984 termination date were entitled to share in the distribution of the plan surplus.
 
 
 11
 In 1985, surplus plan assets were distributed in part to plan participants whose contributions remained in the HMW plan and in part to HMW. Those employees of Wallace and Metals who rolled over their contributions from the HMW plan to their new pension plans prior to the effective date of the plan termination received no part of the surplus distribution. Had these employees maintained their contributions in the HMW plan, they would have shared in the surplus reversion.
 
 
 12
 Named plaintiffs filed suit in May 1986 alleging that HMW had breached its fiduciary duties of care and loyalty, inter alia, by failing to investigate Payonk's right to share in the surplus and by failing to inform Payonk of the impending termination in violation of ERISA section 404, 29 U.S.C. Sec. 1104. Payonk further alleged that HMW breached the prohibition against self-dealing contained in ERISA section 406, 29 U.S.C. Sec. 1106, by failing to notify class members of "important and material facts about their interest in the HMW plan, thereby increasing the reversion of surplus assets to themselves or the corporate interests they represent."
 
 
 13
 HMW moved for summary judgment and Payonk moved for partial summary judgment. The district court granted HMW's motion on the grounds that the plan terminated by HMW was not subject to the fiduciary standards prescribed in Sec. 404 and Sec. 406, that the termination of HMW's plan was made by HMW in its business capacity; that HMW had no duty to notify Payonk of the HMW plan termination until the termination date was fixed; that HMW as employer had no duty to disclose formulative or preliminary information leading up to the termination of the plan; that PBGC regulations prescribed the time and manner of notice of termination; that HMW had complied with those PBGC regulations and that therefore HMW had breached no duty to the former plan members. Payonk appealed.
 
 II.
 
 14
 Our review of an appeal from the grant of a motion for summary judgment is plenary. Where factual controversies exist, disputes over material facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, or where the facts are not disputed, there is no genuine issue for trial. Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).
 
 
 15
 Here, the facts are undisputed. We must therefore determine whether the district court properly analyzed the relevant legal principles governing the parties' dispute when it concluded that judgment should be entered for HMW.
 
 III.
 
 16
 We first turn our attention to the question whether, under the circumstances of this case, HMW's decision to terminate its plan was strictly a corporate management business decision, which by its nature imposed no fiduciary duties on HMW, see Trenton v. Scott Paper Co., 832 F.2d 806 (3d Cir.1987) cert. denied, --- U.S. ----, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); or whether the decision to terminate was an action subject to fiduciary duties governed by Sec. 404 and Sec. 406.[4]
 
 
 17
 The determination as to whether the decision taken was a business corporate management decision or whether it was an action falling within the fiduciary functions delineated by ERISA is a threshold determination in our analysis. As we understand the jurisprudence in this area, where an administrator of a plan decides matters required in plan administration or involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by ERISA attach. See Rosen v. Hotel Restaurant Emp. Bartenders Union, 637 F.2d 592 (3d Cir.) cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Where, however, employers conduct businesses and make business decisions not regulated by ERISA, no fiduciary duties apply. And, when employers wear "two hats" as employers and as administrators "... they assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." Amato v. Western Union Intern., Inc., 773 F.2d 1402, 1416-17 (2d Cir.1985) cert. dismissed, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986).
 
 
 18
 It is these principles that must guide us in our analysis and in assessing the arguments advanced by Payonk.
 
 A.
 
 19
 Payonk's arguments may be summarized as follows: first, Payonk does not contend that the decision by HMW to terminate its plan was a fiduciary decision. (Appellant Br. at 22.) Thus, Payonk concedes that when the district court concluded that HMW's decision to terminate its plan was exempt from ERISA's fiduciary obligations under the cases on which the district court relied, the district court was correct in relying on those authorities.[5] (Appellant Br. at 23.) Payonk, however, contends that even though the termination of HMW's plan was not a fiduciary decision, there was an obligation upon HMW to protect the existing interests and entitlement of the beneficiaries, i.e., the plaintiff class members in the termination process. Referring to the Sixth Circuit opinion in Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154 (6th Cir.1988) which reversed Ogden v. Michigan Bell Telephone Co., 657 F.Supp. 328 (E.D.Mich.1987), (the district court case upon which the district court in the instant action relied), Payonk argues that HMW had an affirmative duty to disclose termination information which it possessed. Payonk claims that rather than disclosing such information, HMW withheld that information in breach of its duty.
 
 
 20
 In short, we understand Payonk's position to be that although the decision to terminate was not a fiduciary decision, fiduciary obligations arose as a consequence of HMW's business decision to terminate. Stated otherwise, Payonk argues that while the decision to terminate is a business decision, that nevertheless the treatment of the interests of those who would claim as individual beneficiaries and participants fall within fiduciary responsibilities of the plan administrator.
 
 
 21
 In this respect, Payonk's argument resembles the argument made by plaintiffs in Berlin, supra, where the Berlin plaintiffs also conceded that Michigan Bell's decision to offer a new plan (MIPP) from which plaintiffs were excluded, was a non-fiduciary decision. The Berlin plaintiffs argued that a distinction had to be drawn between the actual corporate decision to offer new benefits and communications made by fiduciaries to potential plan participants about such a new offering. Berlin, 858 F.2d at 1161. The district court in Berlin, had rejected any such distinction, finding that "[i]t would be illogical to hold that even though the ultimate decision to offer MIPP was a business decision, that representations about the eventuality were made in a fiduciary capacity." Id. Because of its holding that the decision to offer MIPP benefits was a business decision and that therefore any communications relating to that decision were not fiduciary in nature, the district court in Berlin did not reach the question of whether misrepresentations which misled the Berlin plaintiffs, actually occurred with respect to the new MIPP plan.
 
 
 22
 The court of appeals, in reversing the district court's summary judgment in favor of Michigan Bell, focused its attention on the issue of affirmative misrepresentations and held that the plan fiduciary had a fiduciary duty not to make negligent or intentional misrepresentations to plan participants concerning the MIPP offering. This holding was reached in the context of facts that charged Michigan Bell with having excluded plan participants from the new plan by reason of affirmative misrepresentations made by Michigan Bell's district Manager.[6]
 
 
 23
 Thus, the thrust of the Berlin opinion centered on the misrepresentations alleged by the Berlin plaintiffs. It is for that reason the Berlin court held that liability will lie only if material misrepresentations in violation of 29 U.S.C. Sec. 1104 are proven by the plaintiffs. Id. at 1164. That holding distinguishes Berlin from the facts before us. For in the instant case, the record reveals no claims or assertions that HMW had misrepresented its termination decision. Rather, Payonk's claim is that notification should have been given at a time when HMW merely contemplated the termination of the plan but had not yet decided to do so. In the absence of any claim that Payonk was mislead by affirmative misrepresentations made by HMW, Payonk cannot rely on Berlin as authority for imposing fiduciary duties on HMW.
 
 
 24
 As noted, Payonk argues that HMW breached its fiduciary duty by failing to notify the Metals and the Wallace employees of HMW's proposed plan termination. In support of this argument Payonk refers us to Delgrosso v. Spang and Co., 769 F.2d 928 (3d Cir.1985), cert. denied 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986), arguing that this court has held that "a business decision to terminate a pension plan does not render fiduciary obligations inapplicable to recapture of a surplus in which employees have a legitimate interest." (Appellant Br. at 21.) Payonk also seeks to support his position by referring to Rosen v. Hotel & Restaurant Emp. Bartenders Union, 637 F.2d 592 (3d. Cir.), cert. denied 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981).
 
 
 25
 Payonk's reliance on Delgrosso and Rosen is misplaced. In Delgrosso the employer breached its fiduciary duty under ERISA by unilaterally amending its pension fund to provide for a reversion of plan assets to itself in violation of the pension agreement. This fiduciary duty stemmed from its general duty under ERISA as an administrator of the plan and thus as a fiduciary. The employer's decision to amend its plan in violation of the existing pension agreement to provide for a reversion to itself was not an action which could be given effect as a corporate management decision. Hence, fiduciary obligations attached.
 
 
 26
 Here, on the other hand, no violation of the pension agreement occurred and the decision to terminate the HMW plan could only have been made and effectuated by HMW in its role as employer. No other party, including in particular HMW as administrator, had the authority to make that decision. Until the termination decision became final on March 7, 1984 (to be effective March 31, 1984) disclosure was not required because (1) prior to March 7, 1984, the discussions concerning termination were preliminary, indefinite and subject to change; (2) as a corporate management decision, the decision to terminate did not impose fiduciary obligations on HMW in its role as employer; (3) no Berlin type misrepresentations took place which might implicate general fiduciary disclosure, see Berlin, supra; and (4) ERISA requirements of disclosure did not provide for notice until 10 days prior to March 31, 1984. Notice in fact was given in accordance with 29 C.F.R. 2616,[7] on March 12, 1984, five days after the March 7, 1984 decision to terminate and well before the ten day deadline prescribed by regulation.
 
 
 27
 Reliance on Rosen v. Hotel & Restaurant Emp. Bartenders Union, 637 F.2d 592, 599-600 (3d Cir.) cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981) is similarly misplaced. Rosen involved a situation where an employer failed to make contributions to the pension fund administered by the union. This failure resulted in denying Rosen, the employee, of his benefits since the trustee-union failed to inform Rosen of his employer's delinquency and Rosen's pension was dependent on his employer's continuing contributions. We held that under such circumstances a trustee administering the fund, i.e. the plan administrator, had the fiduciary duty to inform an employee of his employer's failure to make required contributions to the fund.
 
 
 28
 Hence, Rosen did not address an employer's fiduciary duty in connection with a corporate management decision. Rosen only addressed the fund administrator's fiduciary duty to safeguard the fund for its beneficiaries. Accordingly, neither Delgrosso nor Rosen address the issues in question here and are both inapposite on their respective facts.
 
 
 29
 Other courts of appeals have even held that an administrator who has complied with the statutory standard for disclosure cannot be said to have breached a fiduciary duty of failing to provide information concerning preliminary or formulative discussions involving proposed changes. Stanton v. Gulf Oil Corp., 792 F.2d 432 (4th Cir.1986) (it is not a violation of ERISA to fail to furnish information regarding amendment to a plan before those amendments are put into effect.); Porto v. Armco, 825 F.2d 1274 (8th Cir.1987), cert. denied --- U.S. ----, 108 S.Ct. 1114, 99 L.Ed.2d 274 (1988) (an administrator who complies with ERISA standards for disclosure cannot be said to have breached his duty by not providing earlier disclosure). In this circuit, a district court has also addressed this issue. See, Trexel v. E.I. Dupont De Nemours & Co., No. 85-759 (D.Del. September 9, 1987), aff'd mem., 845 F.2d 1016 (3d Cir.1988).
 
 
 30
 In Trexel, the plaintiff alleged a breach of a fiduciary duty based on the fact that among other things, he had not been informed of discussions concerning proposed early retirement benefits programs that were eventually approved and for which he would have been eligible had he delayed his retirement by one month. The district court found nothing in the language of ERISA to indicate that there was a duty imposed on an employer, here the defendant Dupont, to disclose information about benefit plans prior to the time they took effect. As a result Trexel was not eligible for the later approved benefits.
 
 
 31
 In many ways Payonk presents a claim similar to Trexel's in that in Payonk's case the termination of the plan itself did not take place until after Payonk had withdrawn from the HMW plan to enter the Metals-Wallace plan. As we have previously observed, although HMW meetings were held in January 1984, HMW could not resolve differences concerning the makeup of the its plan. Payonk argues that the duty to act for the exclusive benefit of the beneficiaries required HMW to inform plan participants of the impending termination after a meeting held on January 5, 1984. However, neither the record nor the case law supports Payonk's position.
 
 
 32
 The record reveals that the participants at the January 5, 1984 meeting, Gloria Strantz, Manager of Employee Benefits at Hamilton Technology, and Richard H. Van Hoesen, Director of Administration of Clabir Corp., respectively aver in their affidavits that the January 5, 1984 meeting adjourned without decision on whether the plan would be terminated. (App. 142-43; 107).
 
 
 33
 Strantz averred that "... there was no consensus reached that the proposed termination would proceed, because of various problems discussed regarding the proposal ... The meeting adjourned without a decision on whether to implement the proposed termination." (App. 142-43) (emphasis added). Van Hoesen stated
 
 
 34
 "At the meeting, Kenneth Bernhardt, President of HamTech, expressed considerable misgivings regarding termination of the HMW Plan.... The meeting adjourned without decision on whether the Plan would be terminated. Indeed, Mr. Bernhardt's strong urging to retain the early retirement package was a significant obstacle to reaching a final decision on termination. Since termination of the Plan was one step toward the desired goal of implementing a new benefits program at HamTech, a decision to terminate could not be reached until we determined what its replacement would be. While part of our concern was employee relations (as we did not want to announce a Plan termination to HamTech employees until we were also ready to announce the replacement retirement program), our concern was more fundamental: we viewed the potential termination of the HMW Plan and the institution of a new replacement plan as integral parts of a single process. (App. 107-08)
 
 
 35
 Moreover, Payonk relies on the letter of December 19, 1983 to demonstrate that a decision had been made.[8] But that letter only stated that this letter will "serve as your authorization to begin termination." (App. 115). As the letter reflects, the process was a long and involved one and as the record reveals, contrary to Payonk's assertions, by January 5, 1984 no final decision had been made. Accordingly, the original tentative termination date of February 1, 1984 date was delayed until March 31, 1984. On March 7, 1984, when HMW had finally resolved these differences and agreed to a termination date for the old plan, HMW notified their plan participants within 5 days, well within the statutory 10 day requirement of 29 C.F.R. 2616.3 and 2616.4. Thus, as the uncontested record reveals, no final decision was made until March 7, 1984.
 
 
 36
 Like the events described in Trexel, the HMW procedures for plan termination were not in effect at the point that the plan beneficiaries, such as Payonk, "opted-out".[9] Rather discussions were still ongoing to resolve the open issues. Under the then existing statutory requirements and case law, there was no duty to disclose preliminary termination discussions until a final decision was made. See, Porto, Stanton.
 
 
 37
 Thus, the fallacy in Payonk's argument lies in his failure to distinguish between the role played by HMW as an employer, who in that capacity owes a fiduciary duty not to the plan participants, but to its stockholders, and the role played by HMW as a fiduciary of the plan where its fiduciary obligations pertain solely to plan administration, and to the plan participants. Here, Payonk, while acknowledging that HMW was not acting in a fiduciary capacity with respect to plan participants when it made its termination decision, nevertheless insists that the information acquired in the decision-making process was possessed by HMW in just such a fiduciary capacity.
 
 
 38
 As we have earlier explained, the fiduciary roles of the employer and plan administrator differ, as they are separate entities. Indeed, HMW, as plan administrator, would not normally be aware of the decision making process until after a decision on termination (or on any other plan change brought about by reason of a business decision) had been made by HMW as employer. This may explain why the regulations do not require HMW as administrator to disclose or provide notice of, an intention to terminate until HMW as administrator is in a position to file with the PBGC. Since the statute expressly sanctions an employer wearing "two hats," see ERISA, Sec. 408(c)(3), 29 U.S.C. Sec. 1108(c)(3), we can perceive no reason why HMW's decision to terminate its plan should put Payonk in a better position than Payonk would otherwise have been in had someone other than HMW been the plan administrator.
 
 
 39
 Thus, we hold that an employer's lawful termination decision, absent affirmative misrepresentations designed to mislead plan participants, is not governed by ERISA's standards of fiduciary duties. As a consequence, the 10-day notice mandated by ERISA, see 29 C.F.R. 2616.3 and note 6 supra, when complied with, is all the notice that must be given when a plan such as HMW's was terminated.
 
 D.
 
 40
 Because the termination decision occurred in 1984, the relevant statutory provisions of ERISA and their regulations to which we have referred to in this opinion were those in effect at that time. Since that time, Congress has amended the termination and notice of termination provisions. These amendments give added support to the conclusions we have reached today.
 
 
 41
 In 1986 Congress enacted the Single-Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99-272, Title XI, 99th Cong., 2nd Sess., which, among other things, amended ERISA Sec. 4041, 29 U.S.C. Sec. 1341 (1986) by prescribing a new procedure for plan terminations. It is significant that although the requirement of advance notification to plan participants was previously established only by PBGC regulations, Congress amended ERISA Sec. 4041 to require such notification as a matter of statute. Congress also increased the advance notification period from the 10 days prescribed by 29 C.F.R. 2616.3 to the 60 days mandated by the 1986 statute. See ERISA Sec. 4041(a)(2), 29 U.S.C. Sec. 1341(a)(2) (1986) (as amended).[10]
 
 
 42
 The amended statute which is still measured from the proposed termination date and not from the date of preliminary discussions, also requires that more detailed notification be given to each participant, specifying the amount of benefits due to the participant as of termination, the form of benefits, and the various factors (including length of service, age, wages, interest rate assumptions, etc.) on which the benefits are calculated. ERISA Sec. 4041(b)(2)(B), 29 U.S.C. Sec. 1341(b)(2)(B) (as amended). But even the new amendments require no notification to plan participants of any management discussions held preliminary to the fixing of a termination date.
 
 
 43
 Furthermore, in 1987 Congress amended Sec. 4044 of ERISA, 29 U.S.C. Sec. 1344, which treats with the distribution of assets upon termination. The amendment which is part of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, Title IX, 100th Cong., 1st Sess., 101 Stat. 1330-359 is known as the Pension Protection Act. Under the amended Sec. 4044, when a termination occurs in a contributory plan having a surplus, the surplus is to be shared not only by current plan participants, but by any former participants who cashed out of the plan within the previous three years.[11]
 
 
 44
 In short, if this 1987 statute had been in effect in 1984, Payonk undoubtedly would have shared in the HMW distribution. But such was not the case, and as the 1987 amendment implies, no such distribution to former plan participants was available under ERISA as it existed in 1984.
 
 F.
 
 45
 Payonk also argues that the distribution of surplus assets from the fund constituted self-dealing under 29 U.S.C. Sec. 1106, see text of statute, supra, note 9, which among other things, proscribes a fiduciary from dealing with the assets of the plan in his own account.[12] We have earlier discussed the difference between the fiduciary obligations of an employer and that of a plan administrator, even when they are one and the same party and the principles set forth in that discussion, pertaining to disclosure of information, are equally applicable here. That analysis requires that Payonk's argument be rejected here as well.
 
 
 46
 Moreover, because HMW had the authority to terminate the plan and to distribute the remaining assets pursuant to 29 U.S.C. Sec. 1344--the statute which provides for distribution of a plan's assets on termination--it could do so without regard to violating the fiduciary standards established in Sec. 1106 inasmuch as 29 U.S.C. Sec. 1108(b)(9)[13] expressly exempts the lawful distribution of a terminated plan from the provisions of Sec. 1106.
 
 VII.
 
 47
 We will affirm the district court's order of June 27, 1988 which granted HMW's motion for summary judgment.
 
 STAPLETON, Circuit Judge, Concurring:
 
 48
 If HMW had held the information generated by its deliberations over termination in a fiduciary capacity for Plan participants, I would have difficulty upholding the district court's summary judgment in favor of the defendants. The present record would permit an inference that HMW's management had made the decision to terminate the Plan by as early as the end of 1983 and that the continuing deliberations concerned only what would be offered to the employees of HamTech in its place. If one draws this inference (or indeed any of a number of other possible inferences involving somewhat less certainty about Plan termination), I am inclined to believe a fiduciary of the Plan possessing that information as such a fiduciary and knowing that Plan participants were being pressed to sell their interest in the Plan (i.e., roll over to the Wallace or Metals Plans) would be obligated under the common law of trusts to advise Plan participants of the likelihood of a termination.[1] I join in affirming the district court, however, because I believe the information HMW and the other defendants are accused of having withheld was held by them in a fiduciary capacity for the corporation and its stockholders and not in a fiduciary capacity for plan participants.
 
 
 49
 Payonk acknowledges that HMW made its decision to terminate the plan in its capacity as the plan sponsor. Payonk thus concedes, as he must, that the defendants, in making that decision, owed no fiduciary duty to the plan or to its participants. The decision to terminate was a business decision, presumably made in the best interest of the corporation and its stockholders. What Payonk fails to explain is why, if that decision was not made in a fiduciary capacity with respect to the plan, the information generated internally in the course of making that decision is not possessed free of a fiduciary duty to the plan and its participants.
 
 
 50
 Under ERISA the roles of plan administrator and plan sponsor are distinct. The plan administrator owes a fiduciary duty to plan participants; the plan sponsor, as long as it is not acting as an administrator, generally does not. 29 U.S.C. Sec. 1002(21)(A) (1985); 29 U.S.C. Sec. 1108(c)(3) (1985); Amato v. Western Union Int'l. Inc., 773 F.2d 1402, 1416-17 (2d Cir.1985); Trenton v. Scott Paper Co., 832 F.2d 806, 809 (3d Cir.1987); United Ind. Flight Officers v. United Air Lines, 756 F.2d 1274, 1279-80 (7th Cir.1985). The Act permits a sponsor to decide whether to have someone else act as plan administrator or to serve itself in both capacities. Amato, 793 F.2d at 1416-17; Sleichter v. Monsanto Co., 612 F.Supp. 856, 858 (E.D.Mo.1985). When the roles are separately filled and the sponsor makes corporate business decisions regarding termination, changes in benefits, or other plan amendments, it has no fiduciary duty to disclose its decision and need not do so until disclosure is expressly required by the Act or the regulations. In the context of plan amendments, the courts have been unanimous in adopting precisely this view: Changes in plans need not be disclosed until they become effective. Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir.1988); Sleichter v. Monsanto, 612 F.Supp. 856, 858 (E.D.Mo.1985); Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 567 F.Supp. 1184, 1196 (N.D.W.Va.1983).[2] Since the Plan administrator in a situation of this kind will ordinarily receive no information concerning the sponsor's decision until the sponsor chooses to announce it, the Plan participants will not normally be advised of a change until disclosure is expressly required by the Act or the regulations or until the sponsor voluntarily elects to make an earlier disclosure.
 
 
 51
 I do not think that Congress, having given sponsors the choice of serving in a dual capacity, intended to penalize those corporations so choosing by requiring greater disclosure of business decisions from them than from corporations acting solely as plan sponsors. And, from the perspective of plan participants, I do not think Congress contemplated that the amount and timing of information available to participants would depend on the unrelated, discrete issue of whether the sponsor also serves as administrator.
 
 
 52
 Under the PBGC regulations, a plan administrator is not required to give notice of a decision to exercise a power of termination until the sponsor is prepared to go public with the filing of a Notice of Intent to Terminate with the PBGC. 29 C.F.R. Sec. 2616.3(c). This may well constitute a recognition by the PBGC that an independent administrator will have no right to that information before that time. In any event, where, as here, employees of a corporation that serves as both plan sponsor and plan administrator possess information regarding a decision to terminate solely because of services they render to the corporation in connection with that decision, I perceive no basis for imposing a duty of disclosure upon them or their employer beyond that specifically imposed by the Act and regulations. Accordingly, I would hold that the only duty to disclose in this case was the duty imposed by 29 C.F.R. Sec. 2616.1 et seq. and that the judgment in the defendant's favor should be affirmed because that duty was fulfilled.
 
 
 53
 MANSMANN, Circuit Judge, dissenting.
 
 
 54
 In this ERISA case we are faced with the issue of whether, under the unusual circumstances presented, pension plan fiduciaries have a duty under Sec. 404 of the Employee's Retirement Income Security Act, 29 U.S.C.A. Sec. 1104 (West 1985), to notify the plan participants of an impending termination of the plan prior to the ten day requirement of the Pension Benefit Guaranty Corporation regulations found at 29 C.F.R. 2616 et seq. I would hold that the fiduciary's duty to inform the participants of an impending termination is implied in the "prudent man standard of care" of Sec. 1104 where the termination date is reasonably definite and the fiduciary knows that the participant is taking action with respect to his interest unaware of the proposed termination or the effect it would have with respect to his interest. Accordingly, I would reverse the order of the district court granting summary judgment to the defendants and remand to the district court to enter judgment for the plaintiffs on their cross-motion and for a determination of damages.
 
 I.
 
 55
 Payonk's argument is that HMW breached its fiduciary duty by failing to notify the Metals and the Wallace employees of the proposed plan termination. Payonk contends that if the employees had known of the termination, they would have remained participants in the Plan and would have shared in the distribution of the surplus resulting in over $500,000 being shared by the plaintiff class.
 
 
 56
 HMW asks us to reject this argument based on a recent district court opinion in Trexel v. E.I. DuPont De Nemours & Co., No. 85-759 (D.Del. September 4, 1987), aff'd mem., 845 F.2d 1016 (3d Cir.1988), which held, inter alia, that the employer-administrator has no obligation under ERISA to provide information about a proposed change before it takes effect. In its general holding, Trexel, which involved a suit brought by an employee against his employer for breach of fiduciary duty and misrepresentation concerning the implementation of a retirement incentive program, is in accord with decisions of the Courts of Appeal for the Fourth and Eighth Circuits. For example, in Stanton v. Gulf Oil Corp., 792 F.2d 432 (4th Cir.1986), the court stated that "it is not a violation of ERISA to fail to furnish information regarding amendments before these amendments are put into effect." 792 F.2d at 435. Similarly, in Porto v. Armco, Inc., 825 F.2d 1274 (8th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1114, 99 L.Ed.2d 274 (1988), the Court of Appeals for the Eighth Circuit held that a plan "administrator who complies with the statutory standard for disclosure cannot be said to have breached the fiduciary duty by not providing earlier disclosure." 825 F.2d at 1276.
 
 
 57
 I reject HMW's reliance on Trexel because I find it factually distinguishable on several points. First, at the time Trexel was told there would be no new retirement incentive programs initiated at DuPont, none were in effect. In contrast, at the time HMW Plan participants were facing the choice of making a withdrawal or roll-over, the procedures for termination of the HMW Plan were in effect. Second, Trexel's retirement occurred prior to the implementation of the plan, thus, he was not an employee entitled to the benefit. Here, although not employees of HMW, the Metals and Wallace employees were plan participants and entitled to have their interests protected under ERISA fiduciary standards. Finally, an unpublished memorandum opinion is not binding on subsequent panels of our court. See IOP Chapter 8(c) (3d Cir.).
 
 
 58
 PBGC regulations published in 29 C.F.R. 2616 et seq. regarding "notice of intent to terminate non-multi-employer pension plans" provide as follows:
 
 
 59
 Sec. 2613.3 Requirement of Notice ...
 
 
 60
 (c) When to file. The Notice of Intent to Terminate shall be filed with the PBGC at least 10 days prior to the proposed date of termination of the plan.
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 Sec. 2616.4 Notice to participants and retirees.
 
 
 64
 (a) General. The plan administrator shall, in accordance with this section, notify participants and retirees covered by the Plan of the proposed termination no later than the date the Notice of Intent to Terminate is filed pursuant to this part.
 
 
 65
 (Emphasis added). HMW notified its employees on March 12, 1984 of the intent to terminate effective March 31, which was the same time it notified the PBGC. HMW asks us to affirm the district court's decision because HMW complied with all regulatory requirements.
 
 
 66
 Payonk counters that, since 29 U.S.C.A. Sec. 1104 imposes a duty on fiduciaries to act for the benefit of the pension plan and its participants, HMW violated this duty by failing to notify employees of material and relevant facts concerning their interests in the Plan.[1] In so arguing, Payonk relies on Rosen v. Hotel & Restaurant Emp. Bartenders Union, 637 F.2d 592 (3d Cir.1981), cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 in which we held that an administrator had breached its duty by failing to notify a plan participant that his employer was no longer making contributions. In so holding we noted that such a duty has its roots in common law. Indeed, the Restatement (Second) Trusts Sec. 173, Comment d (1959), provides:
 
 
 67
 [The trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest.
 
 
 68
 Rosen, 637 F.2d at 600 n. 11, citing Restatement of Trusts (Second) Sec. 173, Comment d.
 
 
 69
 I agree with Payonk that, under the specific circumstances presented, the duty involved is more clearly representative of a fiduciary's duty in the administration of a trust and is distinguishable from those cases where the courts determined that the decision to terminate a plan was purely a business decision. See Chait v. Bernstein, 645 F.Supp. 1092 (D.N.J.1986), aff'd, 835 F.2d 1017 (3d Cir.1987) (an administrator's termination decision is not governed by ERISA's fiduciary duties).
 
 
 70
 In fact, the decision to terminate is usually the result of circumstances impacting on the plan sponsor--such as insolvency or the loss of the tax deduction when the plan is over funded. See 29 U.S.C.A. Sec. 1342 [termination by PBGC] and 26 U.S.C.A. Sec. 404 [deductions for contributions by employer to employee plan]. In other words, while the decision to terminate is a business decision, the treatment of the interests of the individual beneficiaries and participants falls within the fiduciary responsibilities of the plan administrator. Cf. Rosen, 637 F.2d at 599-600; and Central States Pension Fund v. Central Transport, Inc., 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) (trustee's duty to provide for the benefit of all plan participants justifies trustee's demand of an audit of employer records).
 
 
 71
 In discussing the framework of the ERISA-imposed fiduciary responsibilities, the Supreme Court stated in Central States that:
 
 
 72
 In general, trustees' responsibilities and powers under ERISA reflect Congress' policy of "assuring the equitable character" of the plans. Thus, rather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility. See, e.g., 29 U.S.C. Sec. 1103(a) ("assets of an employee benefit plan shall be held in trust"); S.Rep. No. 93-127, p. 29 (1973) ("The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts"); H.R.Rep. No. 93-533, p. 11 (1973) (identical language); ... [Emphasis in original.]
 
 
 73
 Central States, 472 U.S. at 570 and n. 10, 105 S.Ct. at 2840 and n. 10.[2]
 
 
 74
 In addition to the statutory fiduciary responsibilities encompassed in ERISA, HMW, being the plan's sponsor, was bound by the terms of the HMW Pension Plan agreement. Section 14.2 of the Plan specifically provided that:
 
 Fund for Exclusive Benefit of Participants
 
 75
 The Fund is for the exclusive benefit of Participants and other persons who may become entitled to benefits hereunder and may also be used to pay any reasonable expenses arising from the operation of the Plan. Prior to the satisfaction of all liabilities for benefits provided hereunder, no contribution made to the Fund will be refunded to the Employer unless a contribution was made:
 
 
 76
 (A) by reason of mistake of fact,
 
 
 77
 (B) conditionally upon an initial favorable Internal Revenue Service ruling and such a ruling is not received, or
 
 
 78
 (C) conditionally upon being allowed as a tax deduction and such deduction is disallowed.
 
 
 79
 Such a refund must be made within one year, under (A), from the date the contribution was made and under (B) and (C), from the date of disallowance of tax qualification or tax deduction.
 
 
 80
 Furthermore, Sec. 16.2 described the plan administrator's duties and responsibilities as follows:
 
 Duties and Authority
 
 81
 The Plan Administrator shall administer the Plan on behalf of the Principal Employer in a nondiscriminatory manner for the exclusive benefit of Participants and their Beneficiaries.
 
 
 82
 The Plan Administrator shall perform all such duties as are necessary to operate, administer, and manage the Plan in accordance with the terms thereof, including but not limited to the following:
 
 
 83
 (A) To determine all questions relating to a Participant's coverage under the Plan,
 
 
 84
 * * *
 
 
 85
 * * *
 
 
 86
 (E) To advise or assist Participants regarding any rights, benefits, or elections available under the Plan.
 
 
 87
 One of the elections available to participants of the Plan was the choice of whether to remain in the Plan after the subsidiaries were divested or to withdraw from the Plan. In order to make a reasoned and informed choice, the participants must be aware of all material facts which would tend to influence that choice. See Restatement (Second) Trusts Sec. 173, comment d (trustee is under a duty to communicate to beneficiary material facts affecting the interests of the beneficiary.)
 
 
 88
 As to what is a "material fact" necessary for the participants to make an informed choice, I find an analogy to the definition of materiality in securities cases to be helpful. Rule 14a-9, promulgated under Sec. 14(a) of the Security Exchange Act of 1934, provides that no proxy solicitation will be made which "is false or misleading with respect to any material fact necessary in order to make the statements therein not false or misleading." In TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) the Supreme Court recognized that the question of materiality is an objective one since such a standard is necessary "to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." 426 U.S. at 448, 96 S.Ct. at 2132 (Emphasis added). The Court held: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 426 U.S. at 449, 96 S.Ct. at 2132.
 
 
 89
 Generally, the question of materiality is a mixed question of law and fact involving the application of a legal standard to a particular set of facts. "Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." TSC Industries, 426 U.S. at 450, 96 S.Ct. at 2133 (quoting Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir.1970)). It seems apparent that one material fact of which participants contemplating withdrawal from a pension plan should be aware is that termination of the plan is imminent and that they could participate in the distribution of its surplus upon termination. Indeed, in their complaint, the plaintiffs alleged that over $500,000 would have been distributed to the plaintiff class had they remained in the plan. I therefore conclude that HMW had a duty under both Sec. 404 of ERISA (29 U.S.C.A. Sec. 1104) and Sec. 16.2 of the HMW Plan to inform the participants, facing a decision of whether to withdraw from the Plan, of the impending termination.
 
 II.
 
 90
 A legal duty is an obligation which arises from the contract of the parties or by operation of law. As such, it is a legal issue to be determined by the court. Having concluded that there was a duty on the part of HMW to inform the participants of the impending termination, I must address the issue of when the duty arose. To do so, it is necessary to scrutinize the purpose behind the obligations which ERISA imposes on the plan administrator.
 
 
 91
 The statutory fiduciary obligations imposed by ERISA have three basic components. Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154, 1162 (6th Cir.1988) (citing Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)). The first is a duty of loyalty requiring each fiduciary to "act solely in the interests of the plan's participants and beneficiaries." Berlin, 858 F.2d at 1162, citing H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 5083.
 
 
 92
 The second component is known as the prudent man standard of care which requires the fiduciary to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C.A. Sec. 1104(a)(1)(B). Thus, the prudent man standard, "combined with the duty of loyalty"
 
 
 93
 'imposes an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation. These familiar principles evolved from the common law of trusts that Congress codified and made applicable to ERISA trustees.' Morse v. Stanley, 732 F.2d 1139, 1145 (2d Cir.1984).
 
 
 94
 Berlin, 858 F.2d at 1162. The final component is the requirement that the fiduciary act "for the exclusive purpose" of providing benefits to plan beneficiaries. Id.
 
 
 95
 Applying these components of the fiduciary's obligations to the case before us, I conclude that the duty to act for the exclusive benefit of the beneficiaries required HMW to inform plan participants of the impending termination after the January 5, 1984 meeting. I base this determination on several reasons. First, a reading of the depositions of Richard Van Hoesen (Clabir's Director of Administration) and Gloria Strantz (then Manager of Benefits for HMW Industries) indicates that this was the first meeting involving representatives of Clabir, HMW Industries, Inc., HamTech and Connecticut General Life (the plan investor) which fully discussed the major ramifications of the proposed termination among all those who had responsibility for effectuating the termination. Prior to this date, much of the correspondence involving the termination occurred between Clabir's Van Hoesen, his superiors, and HamTech's Owen and Strantz.[3] The January 5 meeting was the culmination of correspondence and communication between Clabir, the actuaries, and the investors of the fund.
 
 
 96
 Second, I note that the tone of the meeting was not one evoking a tentative proposal to terminate, but a tone suggesting for all intents and purposes, termination was not only seriously considered, it was, in fact, imminent. More than the initial steps had been taken to terminate the HMW Plan; all that remained for the Human Resources group to do was the drafting of the new pension plan and new plan booklets. The target date for termination had been February 1, 1984 but the volumes of paperwork necessary to complete the process was taking longer than expected, and the date was pushed back.
 
 
 97
 HMW was concerned about PBGC and IRS approval of the plan termination, however, for an overfunded plan, getting approval is not an onerous task.[4] Under 29 U.S.C.A. Sec. 1341(b) the PBGC is statutorily directed to notify the plan administrator of the plan's sufficiency as soon as practicable.[5] Sufficiency of the plan is determined by whether the assets of the plan adequately "discharge when due all obligations of the plan with respect to benefits in priority categories 1 through 4" of Section 4044(a), 29 U.S.C.A. Sec. 1344(a). 29 CFR Sec. 2617.2 (1987). In an overfunded plan, assets are more than adequate to meet the plan's obligations. Similarly, the IRS' main concern is whether the plan provides that "the rights of each employee to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the rights of each employee to the amounts credited to his account at such time, are nonforfeitable." 26 CFR Sec. 1.401-6 (1988).
 
 
 98
 The January 5 meeting was held to consider seriously the timetables involved and to decide on termination of the Plan. I have used the phrase "to consider seriously" to mirror the language of a recent decision of the Court of Appeals for the Sixth Circuit. In Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154 (6th Cir.1988), the plaintiffs were employees who had retired before a second offering of retirement benefits after communications with management informed them there would not be a second retirement benefit offering. The plaintiffs claimed they were wrongfully denied benefits in violation of ERISA. 858 F.2d at 1157-60. The district court held that the defendants had no duty to disclose under ERISA because making the second offering was a business decision. Ogden v. Michigan Bell Telephone Co., 657 F.Supp. 328 (E.D.Mich.1987). Reversing the district court, the Court of Appeals for the Sixth Circuit stated that "if the plan administrator and/or plan fiduciary does communicate with potential plan participants after serious consideration has been given concerning a future implementation or offering under the plan, then any material misrepresentations may constitute a breach of their fiduciary duties." 858 F.2d at 1164 (emphasis in original). Although factually distinguishable from the instant case since Payonk essentially raises a claim of omission rather than a claim of misrepresentation, I feel the underlying rationale imposing a duty to communicate to be in keeping with the prudent man standard encompassed in 29 U.S.C.A. Sec. 1104.
 
 
 99
 Finally, the presence at the meeting of Gloria Strantz, the Benefits Manager at HMW Industries and the plan administrator of the HMW Plan, assured that the person who had the most direct line of communication with participants of the HMW Plan was fully aware of the status of the termination. On October 25, 1983, Ms. Strantz had sent notice to the employees of the divested subsidiaries that they would no longer accrue benefits under the HMW Plan. The notice informed each individual of the amount of his or her benefit and informed the employee of the right to withdraw from the plan, but did not inform the employees that they could share in any surplus should they remain participants of the plan at the time of termination. Although Ms. Strantz did not communicate again with the divested employees as a group until the March 12, 1984 notice of termination, she did communicate with individuals concerning the pension plan. (App. at 301). In addition, Ms. Strantz was certain of the impending termination during any communication made after January 5, 1984, and she had been informed by the Vice-President of Finance at Katy Industries, Inc., Arthur Bowker, that a 401(k) plan was being prepared for Metals and Wallace employees.
 
 
 100
 Knowledge of the impending termination is a material fact of which a reasonable plan participant would need to be aware in order to make an "informed choice." Cf. TSC Industries, 426 U.S. at 449, 96 S.Ct. at 2132. Consequently, Ms. Strantz' failure to notify of the impending termination those individuals requesting information would constitute a breach of fiduciary duty, and a violation of Sec. 16.2 of the HMW Plan requiring the fiduciary "to advise or assist Participants regarding any rights, benefits or elections available under the Plan."
 
 
 101
 I want to make certain that it is understood exactly what I would hold here. I would not hold that there is a general duty automatically to inform participants of a plan termination before the 10 day PBGC requirement. I would hold that where, as here, the decision to terminate was definite and the fiduciaries knew that the participants were withdrawing their contributions on a belief that the Plan would continue and without knowledge that they could share in the distribution of surplus assets, the fiduciaries breached their duty by remaining silent and failing to inform the Plan participants of a material fact, i.e., termination, which would permit the participants to make an informed choice with respect to their interest in the plan.
 
 
 102
 For these reasons, I respectfully dissent.
 
 
 
 [1]
 The PBGC is a government body created by 29 U.S.C. Sec. 1302 to administer the Mandatory Pension Plan Termination Program. See Pension Benefits Guarantee Corporation v. Greene, 570 F.Supp. 1483, 1485 (W.D.Pa.1983), aff'd, 727 F.2d 1100, cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38
 
 
 [2]
 The issue on this appeal arose prior to the amendment to 29 U.S.C. Sec. 1341(a)(2) (1986). That statutory amendment extended the time for notice to plan participants from 10 to 60 days. In addition, in 1987, 29 U.S.C. Sec. 1344 was amended so that surplus funds would be shared, not only by current participants, but by any former participants who cashed out of the plan within three years
 As we discuss, infra, these actions taken by Congress bolster our analysis and holding that it is ERISA that provides the statutory parameters controlling the notification and rights owed to plan participants when pension plans are terminated.
 
 
 [3]
 For ease in reference we will refer to all defendants as "HMW"
 
 
 [4]
 Section 404 states in pertinent part:
 (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title [not relevant here], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 * * *
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims....
 29 U.S.C. Sec. 1104.
 Section 406 states in pertinent part that:
 Except as provided in section 1108 of this title [not relevant here]:
 A fiduciary with respect to a plan shall not--
 (1) deal with the assets of the plan in his own account, or
 (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants....
 29 U.S.C. Sec. 1106.
 
 
 [5]
 The cases on which the district court relied were Chait v. Bernstein, 645 F.Supp. 1092 (D.N.J.1986) aff'd, 835 F.2d 1017 (3d Cir.1987); District 65 UAW v. Harper & Row Publishers, Inc., 576 F.Supp. 1468 (S.D.N.Y.1983) and Ogden v. Michigan Bell Telephone Co., 657 F.Supp. 328 (E.D.Mich.1987) (App. at 96). Ogden as we discuss, infra, was subsequently reversed in Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154 (6th Cir.1988). As we point out in text, that reversal has no effect on our disposition of this appeal
 
 
 [6]
 As an example of an affirmative misrepresentation that Berlin and his class plaintiffs alleged, the court of appeals recited the following:
 Berlin alleges that he initially notified MBT that he would retire effective June 7, 1982, which would have enabled him to elect MIPP severance benefits. However, he was urged by a district manager for MBT to change his effective retirement date to May 31, 1982, for administrative accounting convenience. Berlin agreed and retired effective May 31, 1982, which placed him one day outside the MIPP offering in question.
 Id. at 1156.
 
 
 [7]
 PBGC regulations published in 29 C.F.R. 2616 et seq. regarding "notice of intent to terminate non-multi-employer pension plans" provide as follows:
 Sec. 2616.3 Requirement of Notice ...
 (c) When to file. The Notice of Intent to Terminate shall be filed with the PBGC at least 10 days prior to the proposed date of termination of the plan.
 * * *
 Sec. 2616.4 Notice to participants and retirees.
 (a) General. The plan administrator shall, in accordance with this section, notify participants and retirees covered by the Plan of the proposed termination no later than the date the Notice of Intent to Terminate is filed pursuant to this part.
 
 
 [8]
 As the record discloses and as stated in the facts, supra, the December 19, 1983 letter sent by Schell, Clabir's Vice-President to Owen, the Human Resources Supervisor at HamTech, did no more than authorize the beginning of termination of the HMW plan, and specified a termination date that could not be effected
 
 
 [9]
 We observe that even had the preliminary termination discussions been made known to the beneficiaries who opted-out, they would still have been faced with a decision as to whether to accept an assured 12.75% return guaranteed by the Wallace-Metals plans or to gamble on a final termination of their existing plan, a decision over which they had no control
 We are also aware that the legislative intent of ERISA was not to assure the sanctity of early retirement expectations, but to safeguard accrued retirement benefits. Bencivenga v. Western Pa. Teamsters, 763 F.2d 574 (3d Cir.1985). Here, all accrued benefits were preserved for those enrolled in the Wallace-Metals plans.
 
 
 [10]
 29 U.S.C. Sec. 1341 (1986). Termination of single-employer plans, provides in pertinent part:
 (a) General rules governing single-employer plan termination
 * * *
 (2) 60-day notice of intent to terminate
 Not less than 60 days before the proposed termination date of a standard termination under subsection (b) of this section or a distress termination under subsection (c) of this section, the plan administrator shall provide to each affected party (other than the corporation in the case of a standard termination) a written notice of intent to terminate stating that such termination is intended and the proposed termination date. The written notice shall include any related additional information required in regulations of the corporation.
 
 
 [11]
 29 U.S.C. Sec. 1344(d)(3)(C) (1987) reads in relevant part as follows:
 For purposes of this paragraph, each person who is, as of the termination date
 (i) a participant under the plan, or
 (ii) an individual who has received, during the 3-year period ending with the termination date, a distribution from the plan of such individual's entire nonforfeitable benefit in the form of a single sum distribution in accordance with section 1053(e) of this title or in the form of irrevocable commitments purchased by the plan from an insurer to provide such nonforfeitable benefit,
 shall be treated as a participant with respect to the termination, if all or part of the nonforfeitable benefit with respect to such person is or was attributable to participants' mandatory contributions (referred to in subsection (a)(2) of this section).
 
 
 [12]
 We observe that the affidavit of Richard H. Van Hoesen (Clabir's Director of Administration) and Gloria G. Strantz (Manager of Employee Benefits at HamTech) both claim that it was not until 1985 that each understood that Wallace and Metals participants who withdrew from the HMW plan would not share in the reversion of surplus
 Hoesen stated:
 I learned in 1985 for the first time that the Wallace and Metals participants who withdrew their contributions prior to the effective date of termination would not share in the reversion of surplus by reason of the withdrawals.
 App. 111.
 Strantz stated:
 The first time I learned that the withdrawal of employee contributions by Wallace and Metals participants affected their ability to share in the Plan surplus was in March of 1985, in a discussion with a representative of Connecticut General.
 App. 146.
 Neither statement is contradicted by Payonk.
 
 
 [13]
 29 U.S.C. Sec. 1108(b)(9) reads in relevant part:
 * * *
 (b) Enumeration of transactions exempted from section 1106 prohibitions.
 * * *
 (9) The making by a fiduciary of a distribution of the assets of the plan in accordance with the terms of the plan if such assets are distributed in the same manner as provided under section 1344 of this title (relating to allocation of assets).
 
 
 [1]
 See Restatement (Second) of Trusts Sec. 173, Comment d (1959):
 [The trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest.
 
 
 [2]
 Rosen v. Hotel & Restaurant Emp. Bartenders Union, 637 F.2d 592, 599-600 (3d Cir.), cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981) is not inconsistent. In Rosen, the information that the employer was not making the required contribution was held by the administrator in his capacity as Administrator, subject to an administrator's fiduciary duty
 
 
 [1]
 29 U.S.C.A. Sec. 1104 provides in pertinent part:
 (a) Prudent man standard of care
 (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 (A) for the exclusive purpose of:
 (i) providing benefits for participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ....
 
 
 [2]
 The majority opinion refers to the 1986 and 1987 amendments to ERISA and notes that if the law had been in effect at the time HMW planned the termination, Payonk and his class would have participated in the distribution of the surplus. I see the change in the law as a recognition of the duty the plan has to the beneficiaries and an attempt to plug the loopholes discovered by employers as a means of avoiding that duty
 The purpose of Subtitle A of Title III, the Pension Assets Protection Act of 1987, as favorably reported by the Committee on Education and Labor are as follows:
 
 
 [1]
 to foster and facilitate interstate commerce;
 
 
 [2]
 to encourage the maintenance and growth of single-employer defined benefit plans;
 
 
 [3]
 to improve benefit security by increasing the likelihood that participants and beneficiaries in single-employer defined benefit plans will receive their full promised benefits by revising the current plan termination rules;
 
 
 [4]
 to improve the likelihood that single-employer defined benefit plans will not be prematurely terminated by employers who desire access to plan assets, thus resulting, in many cases, in:
 a. the reduction of participants' benefit security with respect to future benefit accruals, and
 b. the reduction or loss of the real value of benefits in retirement for participants and beneficiaries, by permitting access by employers to plan assets (above a specified cushion amount) of an ongoing plan, in limited circumstances;
 
 
 [5]
 to minimize both the number of underfunded single-employer defined benefit plans and the extent of underfunding by tightening and better targeting the minimum funding standards for single-employer defined benefit plans that are not fully funded and by making certain other changes relating to funding waivers, and timing of, and liability for pension plan contributions;
 H.Rep. No. 100-391(1) (emphasis added), Report on Title III--Amendments to the Employee Retirement Income Security Act Relating to Plan Termination, Funding, And Other Issues, reprinted at 1987 U.S.Code Cong. & Admin.News 2313-1, 2313-77 & 78 (1988).
 
 
 [3]
 The appendix to Appellants' Brief contains a letter on Clabir stationary dated December 19, 1983 from James M. Schell, Vice President and Chief Financial Officer, to John Owen, Vice-President of Human Resources at HamTech, which stated in pertinent part: "(1) This will serve as your authorization to begin termination of the GR-81 [HMW] pension plan." App. at 743-44. This letter was in response to Owen's December 7, 1983 letter requesting that Schell send him a memorandum or letter "directing Gloria and me to begin the relatively long process of terminating GR-81." GR-81 was the HMW Plan
 
 
 [4]
 Under 29 U.S.C.A. Sec. 1204 ERISA provides for coordination between the Department of Labor and the Department of Treasury as follows:
 Coordination between Department of Treasury and Department of Labor
 (a) Whenever in this chapter or in any provision of law amended by this chapter the Secretary of the Treasury and the Secretary of Labor are required to carry out provisions relating to the same subject matter (as determined by them) they shall consult with each other and shall develop rules, regulations, practices, and forms which, to the extent appropriate for the efficient administration of such provisions, are designed to reduce duplication of effort, duplication of reporting, conflicting or overlapping requirements, and the burden of compliance with such provisions by plan administrators, employers, and participants and beneficiaries.
 29 U.S.C.A. Sec. 1204.
 In addition the PBGC provides a one-stop procedure which allows the plan administrator to fulfill his duty of filing a notice of intent to terminate (NOIT) the plan with one form satisfying both the PBGC and the IRS. The PBGC Operations Manual, Case Processing Division, Insurance Operations Department (IOD) provides in pertinent part:
 Sec. 2371
 Methods of Filing a NOIT
 The IRS/PBGC Form 5310 enables a terminating non-multiemployer defined benefit pension plan covered by Title IV of ERISA to satisfy the filing requirements of both IRS and PBGC in one filing. The filing requirements of both agencies can be satisfied with one filing to PBGC (One-Stop) or by filing separately with each agency (IRS only or PBGC only).
 
 
 [5]
 29 U.S.C.A. Sec. 1341(b) (West 1985) provides:
 (b) Notice of sufficiency
 If the corporation determines that, after application of section 1344 of this title, the assets held under the plan are sufficient to discharge when due all obligations of the plan with respect to basic benefits, it shall notify the plan administrator of such determination as soon as practicable.