

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-1998

# Frank Russell Co. v. Wellington Mgt Co

Precedential or Non-Precedential:

Docket 98-1315

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"Frank Russell Co. v. Wellington Mgt Co" (1998). *1998 Decisions.* Paper 197.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/197

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 18, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1315

FRANK RUSSELL COMPANY, FRANK RUSSELL TRUST
COMPANY, FRANK RUSSELL INVESTMENT COMPANY,
and FRANK RUSSELL INVESTMENT MANAGEMENT
COMPANY

v.

WELLINGTON MANAGEMENT COMPANY, LLP,
        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 98-CV-1703)

Argued on July 14, 1998

Before: SLOVITER AND ROTH, Circuit Judges, and
FEIKENS, District Judge*

(Filed August 18, 1998)

Cynthia M. Clarke (ARGUED)
Harvey E. Bines
Ira K. Gross
Sullivan & Worcester LLP
Boston, MA 02109

_____

*Honorable John Feikens, United States Senior District Judge for the
Eastern District of Michigan, sitting by designation.

Laurence Z. Shiekman
Michael H. Rosenthal
Pepper Hamilton LLP
Philadelphia, PA 19103-2799

 Attorneys for Appellant

Steven M. Felsenstein
Jane Landes Foster
David C. Franceski, Jr.
Stradley, Ronon, Stevens
 & Young, LLP
Philadelphia, PA 19103

 Attorneys for Frank Russell
 Investment Company

Kenneth M. Kolaski
Reed Smith Shaw & McClay LLP
Philadelphia, PA 19103

Donald J. Myers
Douglas K. Spaulding (ARGUED)
Michael B. Richman
David Ober
Reed Smith Shaw & McClay LLP
Washington, D.C. 20005

 Attorneys for Frank Russell
 Company, Frank Russell Trust
 Company and Frank Russell
 Investment Management Company

OPINION OF THE COURT

FEIKENS, District Judge.

Before us is an expedited appeal from an order of the United States District Court for the Eastern District of Pennsylvania ("District Court") preliminarily enjoining the non-compete agreement that was upheld by the Superior Court of Massachusetts. The District Court held that there is a "virtual certainty" that a permanent injunction would

2

be obtained on the merits by the plaintiff-appellees and thus ordered a preliminary injunction effectively foreclosing the enforcement of the injunction.

The appeal raises these issues:

1. Does the Investment Advisers Act of 1940, 15 U. S.C. S 80b-1 et seq., provide a cause of action for plaintiff-appellee?

2. Does the Employee's Retirement Income Security Act ("ERISA"), 29 U.S.C. S 1001 et seq., provide a basis for plaintiff-appellees to claim breaches of fiduciary duties by defendant-appellant?

3. Is the District Court's preliminary injunction order barred by the Anti-Injunction Act, 28 U.S.C. S 2283?

4. Is the District Court's preliminary injunction order barred by the Younger abstention doctrine, see Younger v. Harris, 401 U.S. 37 (1971)?

I. BACKGROUND

In 1996, when Arnold Schneider ("Schneider") decided to leave his position as a partner in the Boston-based defendant Wellington Management Company ("Wellington") and started his own firm, Schneider Capital Management ("SCM"), in direct competition with Wellington, this dispute began. Plaintiffs Frank Russell Company, Frank Russell Trust Company, Frank Russell Investment Company, and Frank Russell Investment Management Company (collectively "Russell"), were Wellington clients serviced by Schneider. When Schneider terminated his employment with Wellington, Russell transferred several of its accounts to SCM.

Schneider joined Wellington upon his graduation from college in 1983, and began working as an analyst in its Valley Forge, Pennsylvania office. He progressed steadily through its ranks and became a partner of the firm in 1992. His extraordinary flair for picking mid-cap stocks led to an average return that exceeded the Standard & Poor's 500 Index by 7.4% for nine consecutive years, and earned him the honor of being recognized as the number one performing value manager in the country for the 1993

3

through 1997 time period. Wellington handsomely compensated Schneider for his efforts; he earned over $1.4 million in his last year of employment with thefirm.

Russell is active in providing financial services and regularly tracks more than 2200 investment management firms such as Wellington. ERISA plans and other institutional investors pay for this information to aid in the selection and monitoring of their investment managers. This leads to a complicated relationship with Wellington because in some instances Russell and Wellington have joint clients and refer business to each other, while at other times they are direct competitors. In the present circumstance, Russell was a client of Wellington's and had entrusted over $1 billion to Wellington's care. The relevant contracts between Russell and Wellington gave Russell the right to terminate the relationship without notice. Wellington was required to give 30-days notice before it terminated the contract. Of the four Russell entities, only Frank Russell Trust Company ("FRTC"), involved assets covered by ERISA. For that contract, Wellington specifically acknowledged it was an ERISA fiduciary.

Wellington is a 54-member limited liability partnership engaged in the business of providing investment advice to its clients. For this, it is paid a fixed percentage of those assets under its control and controls over $200 billion of clients' money. Wellington divides responsibility among its staff in such a way that certain employees are solely responsible for attracting new business while others focus exclusively on providing investment advice. Non-compete agreements are crucial to this division of labor because they prevent partners from "poaching" clients if they leave the firm. Schneider signed such a non-compete agreement. The non-compete clause prevents partners who leave the firm from "providing investment advisory or investment management services" in any capacity for a period of three years, and prohibits doing business with "any client of the Partnership" for a period of five years. Either of these provisions may be waived at the managing partners' discretion.

The events which triggered a cluster of lawsuits began when Schneider tendered his letter of resignation on June

4

22, 1996. As required, Schneider gave six months notice before his date of departure on December 22, 1996. Duncan McFarland ("McFarland"), Wellington's managing partner, did not believe Schneider would go into direct competition with Wellington. Based on his prior experience with departing partners, McFarland was confident that if Schneider did intend to compete with Wellington, he could be talked out of it. McFarland thought Wellington's interests would best be served if Schneider and Wellington would jointly approach Schneider's clients to try to persuade them to keep their business at Wellington. Hoping Schneider would favor such an arrangement, McFarland spent the months following Schneider's June announcement attempting to learn what Schneider planned to do after he left Wellington.

Schneider had a different agenda. His intention was to start his own investment advisory business, and he wanted his new firm to service as many of his former Wellington clients as possible. Schneider wanted to reach a "fee-sharing" agreement with McFarland in which Wellington would waive the non-compete covenants in exchange for a portion of the revenue Schneider generated from Wellington's former clients. Schneider was always vague as to his future plans because he believed McFarland would react negatively if he found out Schneider was going to compete with Wellington. Schneider continually provided McFarland with non-committal responses regarding his post-Wellington plans despite the fact that he had taken concrete steps to prepare for the opening of SCM.

In the meantime, Russell and Schneider had been in contact regarding Schneider's impending departure. Russell privately assured Schneider that it intended to follow him to his new firm. In order to avoid the non-compete agreement's restriction on soliciting Wellington clients, Russell conducted its due diligence inquiry into SCM by submitting written questions to Schneider. Schneider responded by giving a complete update on his progress. The responses to Russell's inquiries were more detailed than Schneider's answers to similar verbal queries by McFarland.

5

By November of 1996, McFarland became increasingly concerned that Schneider intended to "steal" Wellington clients. McFarland expressed his concerns at an emergency meeting of the full partnership on December 3, 1996. Schneider then spoke in his own defense. After Schneider left the meeting, the partnership voted 47-5 to expel him unless he accepted a proposal providing Wellington would waive his non-compete agreement if he would agree not to service any former Wellington clients. Schneider refused this proposal and was summarily terminated.

On December 17, Russell canceled its contract with Wellington and immediately moved its assets to SCM. Two other former Wellington clients, the State of Utah Retirement Board, and RJR Nabisco, made similar transfers.

Wellington then initiated suit in the Massachusetts state court and sought an injunction enforcing the non-compete agreement Schneider signed. After holding a full trial on the merits and presiding over the case for more than a year, the Massachusetts court issued a 115-page opinion upholding the five-year ban on doing business with Wellington clients, and striking the three-year ban on working in the investment advisory business on the grounds that it was an unreasonable restriction. The February 17, 1998, opinion also awarded Schneider certain unpaid incentive compensation that is not presently in dispute. That court enjoined Schneider (the "Massachusetts injunction") from doing business with any Wellington client for five years, effective 60 days after the entry of the order (April 17, 1998). The delay in the effective date of the judgment was designed to give Russell the 30-days notice it would have had if Wellington terminated their contract. While Russell was not a party to the Massachusetts proceedings, it filed three affidavits in the case, presented two days of testimony, and submitted an amicus brief.

On March 31, 1998, three weeks prior to the effective date of the Massachusetts' injunction, Russell brought the suit which involves this appeal in the Eastern District of Pennsylvania. Represented by some of the same attorneys who worked for Russell in the Massachusetts proceeding, Russell sought an injunction enjoining Wellington from

6

enforcing the non-compete agreement. The Utah Retirement Board, one of Schneider's other former Wellington clients, brought a similar suit against Wellington in the United States District Court of Utah. That district court denied the requested injunctive relief, and the case is pending on appeal in the United States Court of Appeals for the Tenth Circuit. See Utah State Retirement Bd. and Office v. Wellington Management Co., No. 98-4060 (10th Cir.). Wellington also sought declaratory judgment against RJR Nabisco, Schneider's other former Wellington client, in the United States District Court for the District of Massachusetts asking that the Massachusetts injunction be declared enforceable. That case is still pending in the district court. Wellington Management Co. v. RJR Nabisco, Inc., No. 98-10916 (D. Mass.).

Russell argues it is entitled to enjoin Wellington from enforcing the non-compete agreement because such enforcement will cause Wellington to breach itsfiduciary duties under ERISA and its duties under the Investment Advisers Act. The breach of these duties, it argues, will cause it to involuntarily switch investment advisors. The new advisor, as is alleged to be the custom, will then sell Russell's present holdings to avoid being tied to any questionable investments Schneider may have made. This sell-off will necessitate Russell having to incur commissions and adverse tax consequences on the order of $13-25 million.

Since the Massachusetts injunction was scheduled to become effective on April 17, 1998, the District Court expedited the hearing on Russell's motion for a preliminary injunction. In its opinion issued on April 13, shortly after the hearing, the court found that Russell would suffer irreparable harm if the non-compete agreement was enforced and that Russell had "a virtual certainty" of success on the merits. The District Court therefore enjoined Wellington from enforcing the non-compete provision, in effect precluding it from enforcement of the Massachusetts injunction.

II. STANDARD OF REVIEW

We review the terms of the preliminary injunction for an abuse of discretion, underlying questions of law receive de

7

novo review, and factual determinations are reviewed for clear error. Acierno v. New Castle County, 40 F.3d 645, 652 (3d Cir. 1994). The standard of review of the Anti-Injunction Act and the Younger abstention doctrine is de novo. 1975 Salaried Retirement Plan for Eligible Employees of Crucible, Inc. v. Nobers, 968 F.2d 401, 403 (3d Cir. 1992).

III. LIKELIHOOD OF SUCCESS ON THE MERITS

In order to obtain a preliminary injunction, the moving party must show 1) irreparable injury, 2) a rea sonable probability of success on the merits, 3) the harm to it outweighs the possible harm to other interested parties, and 4) harm to the public. Continental Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 356-57 (3d Cir. 1980). A court then balances these four Continental factors to determine if an injunction should issue. Russell argues it has a strong likelihood of success on the merits because Wellington has breached its fiduciary duties arising under ERISA and its duties under the Investment Advisers Act.[1]  Wellington allegedly breached these duties when 1) it sought to enforce the Massachusetts injunction to the detriment of Russell, and 2) when it signed Russell as a client  in 1989 without informing Russell that its partners, one of which was Schneider, were bound by non-compete agreements.

To determine whether or not Russell can show a likelihood (or reasonable probability) of success on the merits, Russell must be able to show that it has a cause of action against Wellington based on the Investment Advisers Act ("Act") or that Wellington violated duties, if any, it owed to Russell under ERISA.

A. Investment Advisers Act

Of the four distinct Russell entities, Wellington only managed ERISA assets for FRTC. This means Wellington's fiduciary responsibilities, if any, to the other three Russell companies arise exclusively from the Act. Before Russell

_____

1. Russell also makes reference to Wellington'sfiduciary responsibilities arising under Washington state law. No citation to any case or statute invoking Washington law is ever made, so we do not address this contention.

can attain any relief for the non-ERISA entities, it must satisfy the threshold requirement of showing that the Act entitles it to bring a cause of action against Wellington.

The Investment Advisers Act of 1940 "was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's. ... A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963).

In Transamerica Mortgage Advisors, Inc. v. Lewis , 444 U.S. 11 (1979), the Supreme Court ruled on the issue whether the Investment Advisers Act created a private right of action. The Court held 15 U.S.C. S 80b-15 ("S 215") creates a private right of action for a plaintiff who seeks to void an investment advisor contract.2

This includes the right to bring a suit to obtain "the customary legal incidents of voidness ... including the availability of a suit for rescission or for an injunction

_____

2. "(a) Waiver of compliance as void

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation or order thereunder shall be void.

     (b) Rights affected by invalidity

Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1)  as regard the rights of
any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any per son who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision." 15 U.S.C. S 80b-15.

9

against continued operation of the contract, and for restitution." Id. at 19. The Court noted that 15 U.S.C. S 80b-6 ("S 206") failed to create an express right for a private party to bring a damages remedy and that Congress actually removed such a clause from the section prior to its passage. Thus, the Court concluded that "[u]nlike S 215, S 206 simply proscribes certain conduct, and does not in terms create or alter any civil liabilities." Id. at 19. We conclude that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable." Id. at 24.

Transamerica has a clear application to the present case. If Russell seeks to void its contract with Wellington under S 215, it has a cause of action. Otherwise, it does not. Russell's contracts with Wellington have not been in force since they were voluntarily canceled by Russell on December 17, 1996. Clearly this lawsuit is not an attempt to void an investment advisor contract. In effect, Russell affirms the contract by bringing suit on the S 206 fiduciary obligations the contract gave rise to. Transamerica expressly prevents a private party from suing for a breach of the S 206 duties.3

Since Russell cannot bring an action against Wellington for breach of any duty arising under the Investment Advisers Act, it has no likelihood of eventual success on this issue.

B. ERISA

The contract Wellington signed with FRTC specifies that Wellington is an ERISA fiduciary. Under ERISA,

a fiduciary shall discharge his duties with respect to a

_____

3. Russell cites a number of cases and administrative proceedings where a defendant was found to have violated S 206. See Capital Gains; SEC. v. Moran, 922 F. Supp. 867 (S.D.N.Y. 1996); In the Matter of Aetna Capital Management, and Aetna Financial Services, Inc., Admin. Proc. File No. 3-8119, 1993 SEC LEXIS 2090 (Aug. 19, 1993). These cases are in conjunction with Transamerica's bar to private actions enforcing S 206 because they all involve actions initiated by the Securities and Exchange Commission.

plan solely in the interest of the participants and beneficiaries and –

> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administerin g the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

29 U.S.C. S 1104(1) ("S 404"). Russell claims Wellington breached these duties by seeking to enforce the Massachusetts injunction and by failing to inform Russell that a non-compete clause was part of the partnership agreement. Additionally, Russell argues that enforcing the non-compete agreement would be illegal because it would be a prohibited transaction under ERISA.

1. Breach of duty by seeking to enforce the Massachusetts Injunction

None of the cases cited by Russell directly holds that ERISA fiduciary responsibilities prevent a fiduciary from enforcing a non-compete agreement against a former employee. Its closest case is Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc., 93 F.3d 1171 (3d Cir. 1996). In Glaziers, the defendant brokerage firm Janney Montgomery Scott, Inc. ("Janney") discovered that Michael Lloyd, one of its brokers, might have altered the date on a cashier's check to make it appear he had made timely payment of a nearly $10,000 debt. Consequently, Janney forced Lloyd to resign. Janney then filed a complete report of the incident to the National Association of Securities Dealers. The administrators of the plaintiff pension plans whose assets Lloyd serviced, however, were not informed of Lloyd's potential dishonesty. Janney kept the matter from the administrators because there was no uncontroverted proof that Lloyd had committed the suspected alteration. The pension plans

11

followed Lloyd when he left Janney, and ultimately had over $2 million of their funds embezzled by Lloyd. The plans sued Janney for breaching its ERISA fiduciary duties when it failed to inform them of the reasons for Lloyd's termination. The panel in Glaziers reversed the district court's grant of summary judgment to Janney because, viewed in the light most favorable to the plaintiffs, Lloyd's apparently fraudulent conduct could have been a material fact which Janney had a fiduciary duty to disclose.

Russell reads Glaziers for the proposition that Janney violated its fiduciary duties when it did not volunteer the reason for Lloyd's termination out of fear of a potential defamation suit. Russell argues Wellington similarly breached its fiduciary duties when it chose to enforce the Massachusetts injunction for its own business reasons even though enforcement conflicts with Russell's interests. Russell's position suggests that any decision made by a fiduciary needs to be done for the "exclusive" benefit of the ERISA beneficiary. Glaziers expressly disavowed such a position when it stated "[w]e do not, of course, hold that one who may have attained a fiduciary status thereby has an obligation to disclose all details of its personnel decisions that may somehow impact upon the course of dealings with a beneficiary/client." Id. at 1182.

Such a limitation on the scope of a fiduciary's duties follows the statutory language of S 404. This section states that fiduciary responsibilities only arise when the fiduciary "discharge[s] his duties with respect to a plan." 29 U.S.C. S 1104(1) (emphasis added). Cases hold that a decision which is "strictly a corporate management business decision ... impose[s] no fiduciary duties." Payonek v. HMW Industries, Inc., 883 F.2d 221, 224-25 (3d Cir. 1989). See also Haberen v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1497 (3d Cir. 1994) ("the critical question is whether [the defendants] were acting in their management capacity when they reduced [plaintiff's] salary. ... If they were, then they breached no duty under ERISA for, as they contend, ERISA does not impose fiduciary duties on employers acting in their management capacity."); Hlinka v. Bethlehem Steel Corp., 863 F.2d 279, 286 (3d Cir. 1988) (finding defendant had no

12

fiduciary duty because "[i]t can hardly be disputed that the initiation of these programs was a business decision rather than a fiduciary decision.").

Russell tries to avoid the implication of the "business decision" exception by arguing it is applied only when the fiduciary is an employer. In those circumstances it argues courts invoke the "two hats" metaphor to distinguish between when a company acts as employer (thus, "wearing a non-fiduciary hat"), and when it acts in afiduciary capacity ("wearing a fiduciary hat"). Since Wellington is not an employer, Russell believes the business decision exception is inapplicable.

We reject this contention. No authority supports Russell's position that an employer is relieved of its ERISA obligations when it acts strictly in a business capacity but other fiduciaries are not similarly relieved. Section 404 simply states "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participant." It does not create different or extra duties for those fiduciaries who are not employers. Section 404 exempts any fiduciary from the obligations when it is not acting "with respect to a plan." A fiduciary who acts in a strictly business capacity is not acting "with respect to a plan."

Was Wellington's decision to seek enforcement of the non-compete agreement taken strictly for internal business reasons? While the District Court made no findings as to this issue, the record strongly suggests it was an internal business matter. Wellington's non-compete agreement has been in effect for years prior to the present dispute. It governs Wellington partners whether or not they conduct business with an ERISA entity. The non-compete agreement is an integral part of Wellington's corporate structure because it enables the firm to have a separate department devoted exclusively to recruiting clients without the risk that these clients will be "stolen" by departing partners. The non-compete agreement has been used as part of Wellington's leverage to reach amicable arrangements with prior departing partners.4 Any Russell client having an

_____

4. We note, too, that the Massachusetts court has decided that the non-compete clause is legitimate and enforceable under Massachusetts law.

13

ERISA plan serviced by the prior departing partners would have been unaffected by the non-compete agreement. It is only because Schneider disavowed any effect of the non-compete agreement upon him that Wellington has been forced to protect its interests. Part of the final (appealable) judgment of the Massachusetts case means Russell will no longer have the investment advisor of its choice. Such an impact on an ERISA plan is far more attenuated than any of a number of employer decisions leading to the termination of a plan which have been held to be strictly business decisions. See Payonek, 883 F.2d at 225 n.5 (and cases cited therein). Thus, Wellington made a business decision when it chose to enforce the non-compete agreement.

2. Duty to disclose

Russell also argues that a breach of a fiduciary duty occurred in 1989 when it originally signed with Wellington as a client, but Wellington failed to inform it that Wellington's partners were bound by non-compete agreements. Russell again relies on Glaziers to argue this was a breach of an ERISA fiduciary duty. Russell now cites Glaziers for the proposition that Wellington violated its S 404 "affirmative obligation" to disclose the material fact that it used non-compete agreements "even absent a request [for such information] by the beneficiary." Glaziers, 93 F.3d at 1181.

Russell is correct in stating Wellington had an affirmative fiduciary duty to disclose material information. The question is whether Wellington's failure to disclose its use of non-compete agreements was a material omission"which the beneficiary must know for its own protection." Id. at 1182. The District Court implicitly found that the non-compete covenant was a material fact because Wellington could use it to impose significant transaction costs on Russell by discharging Schneider. This is an erroneous conclusion.

Wellington correctly notes that no published authority requires an ERISA fiduciary to reveal that one of its employees is bound by a non-compete agreement. There are any number of internal matters between Wellington and its

14

employees that could have caused Russell's account to be inadequately serviced. These matters include things such as staffing policies, vacation allotments, and potentially inadequate compensation. Wellington obviously had no obligation to reveal to Russell the minutiae of its internal operations. It was only required to reveal that information which, when viewed without the benefit of hindsight, Wellington reasonably believed Russell would need to know for its own protection. In this case, Wellington had the express contractual right to terminate its relationship with Russell, for any reason, on 30-days notice. Wellington therefore always had the power to impose substantial transaction costs on Russell. The fact that Wellington could impose these same transactions costs through the additional circuitous route of 1) terminating its relationship with a full partner of the firm, and 2) winning a lawsuit enforcing the non-compete agreement, is insufficient to make the existence of a non-compete agreement a material fact. Wellington's ability to impose these transaction costs on Russell for any reason makes the non-compete agreement, when viewed in the light of events as they stood in 1989, an immaterial internal arrangement between Wellington and its partners. Thus, Wellington breached no duty by failing to inform Russell of its existence.

3. Prohibited Transaction

Finally, Russell argues 29 U.S.C. S 1106(a)(1)(c) only allows Russell to contract with Wellington if the agreement between the two parties is "reasonable" under 29 U.S.C. S 1108(b)(2). The United States Department of Labor's interpretive guidelines at 29 C.F.R. S 2550.408b-2(c) state:

> No contract or arrangement is reasonable within the meaning of section 408(b)(2) [29 U.S.C. S 1108(b)(2)] ... if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstance to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

Seizing upon the "without penalty" language, Russell argues it will be forced to pay a $13-25 million penalty if it cannot continue to use Schneider's services. Section

15

2550.408b-2(c) disallows such a penalty and therefore Russell contends Wellington should be prohibited from enforcing the non-compete agreement.

This argument fails for two reasons. First, we note that Schneider is far more responsible for imposing the $13-25 million potential costs on Russell than Wellington is. It was Schneider's choice to sign the non-compete agreement, Schneider's choice to leave Wellington, and Schneider's choice to accept Russell's business in violation of the agreement. Russell had been aware of Schneider's intention to leave Wellington, and Wellington's non-compete agreement, at least as early as June of 1996 when Schneider informed it of these facts. Hence, Wellington is not the party responsible for Russell having to pay these costs.

Second, Russell's argument completely misstates the meaning of the word "penalty." The simple fact is that Wellington will never see a dime of the $13-25 million "penalty" it is allegedly seeking to impose. The "penalty" in this case is not a liquidated sum Wellington charges to Russell. Instead, the transaction costs arise out of the nature of Russell's business. At any time when Russell switches investment advisors it may incur these expenses. Even if Russell were to remain a Wellington client, Russell would presumably still incur the $13-25 million cost because the new Wellington advisor would need to make the same type of alterations to Russell's holdings as any other advisor. Thus, Russell is not "locked" into doing business with Wellington. Since S 2550.408b-2(c) only prohibits a contract which "locks" the ERISA plan into doing business on unfavorable terms, the non-compete agreement does not violate this regulation and this theory has no likelihood of success on the merits.

IV. ANTI-INJUNCTION ACT AND YOUNGER
    ABSTENTION DOCTRINE

Wellington also argues that the Anti-Injunction Act and the Younger abstention doctrine provide grounds to reverse the District Court's grant of an injunction. The Anti-Injunction Act, 29 U.S.C. S 2283, prevents a federal court from staying proceedings in a pending state court case.5

_____

5. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of

16

The District Court's injunction barring Wellington from seeking enforcement of the Massachusetts injunction seems to facially violate this act. See Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281 (1970). Instead of arguing that one of the Anti-Injunction Act's statutory exceptions applies, Russell focuses on showing the Anti-Injunction Act does not affect it because of the judicially-created "stranger to the litigation" doctrine. See County of Imperial, California v. Munoz, 449 U.S. 54 (1980). We note some difficulty in the argument that Russell was a "stranger" to the Massachusetts proceeding because it submitted three affidavits, two days of testimony, and an amicus brief in that case. Because we have an adequate means for deciding this case without reaching this issue, we defer ruling on it.

The Younger abstention doctrine[6] creates an additional set of circumstances in which a federal court is prohibited from enjoining an on-going state action. This occurs when 1) there is an on-going state judicial proceeding, 2) the state proceeding implicates an important state interest, and 3) the state proceeding provides an adequate oppor tunity to raise the constitutional issue. FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 843 (3d Cir. 1996). The pending appeal in Massachusetts state court clearly satisfies the first requirement of the Younger doctrine. Massachusetts' interest in preventing the judgments of its courts from being nullified, in part, by a federal court order may arguably fulfill the second requirements.[7] The third

_____

Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. S 2283.

6. So named because the Supreme Court first announced it in Younger v. Harris, 401 U.S. 37 (1971).

7. It is difficult to find an important state interest involved in Wellington's attempt to enforce its internal non-compete agreement. However, once the Massachusetts Superior Court enjoined Schneider from working for any former Wellington clients, Massachusetts then may have acquired a compelling interest in seeing that the orders and judgments of its court were "not rendered nugatory." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14 (1987); see also Schall v. Joyce, 885 F.2d 101, 109 (3d Cir. 1989).

17

element may be satisfied by showing that Russell's relationship with Schneider was so "intertwined" that the Massachusetts proceeding gave Russell the opportunity to raise its federal claims. See New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Educ., 654 F.2d 868, 878 (3d Cir. 1981). Because these contested issues are not necessary for a resolution of this case, we again decline to rule on them.

V. CONCLUSION

Having reviewed all of Russell's theories, it is clear that Russell has little likelihood of success on any of them. With such a weak showing on likelihood of success, Russell is unable to satisfy the Continental balancing test regardless of its strength on any other element. Therefore, we REVERSE the District Court's order and REMAND with instructions to DISSOLVE the preliminary injunction preventing Wellington from enforcing the non-compete agreement.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit